UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10798-RGS

MARY CONNOLLY

v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

December 30, 2011

STEARNS, D.J.

Mary Connolly seeks review of a final decision of the Commissioner of Social

Security that she is not disabled as defined by the implementing regulations of the

Social Security Act (Act). *See* 20 C.F.R. § 404.1520(f). Administrative Law Judge

Matthew Levin (the ALJ) determined that Connolly is not able to perform her past

relevant work, but that other jobs exist in significant numbers in the national economy

that she can perform.[1] Connolly sought review of the Commissioner's decision in the

district court pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), after her application for

---

[1] The denial of review by the Appeals Council affirmed the decision of the ALJ
as that of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981.

reconsideration and request for review by the Appeals Council were successively denied. The Commissioner, for his part, cross-moves for an Order affirming the final decision. The issue on appeal is whether the ALJ erred by basing his decision on medical and vocational opinions that were beyond his competence. A hearing on both motions was held on December 20, 2011.

## BACKGROUND

Connolly was born in 1960, and was 48 years old at the time of her initial application for disability benefits in June of 2008. She lives with her husband and two teenage sons in their single-family home in Plymouth. Connolly attended Boston College and received a degree in history in 1982. Her struggles with depression and anxiety, exacerbated by her father's death toward the end of her college studies, forced her onto an unanticipated career path. Tr. at 59. From 1984 to 1988, Connolly worked as a customer service agent at UPS. She then began waitressing. In 2003, she obtained a realtor's license. She worked as a realtor until 2007, when she returned to waitressing.

Chronic depression and anxiety run in Connolly's family. She also suffered post-partum depression after the births of her children. She drinks at least several glasses of wine a day, which she acknowledges likely makes her depression and anxiety worse. Tr. at 5-6. Her mental health problems have been exacerbated by the poor state of her

physical health, and she lives a mostly reclusive life. She sleeps late and spends most of her day watching television, although she occasionally visits with neighbors or walks her dog. Tr. at 19. Connolly claims that she does not go out of her home unaccompanied, and she is too anxious to drive herself anywhere on her own. She also complains of weekly panic attacks. Tr. at 22.

*Medical Treatment*[2]

Connolly has an extensive history of medical ailments, including obesity, asthma, depression, and, more recently, cardiac disease, seizures, recurrent gastrointestinal (GI) bleeding, and discogenic and degenerative disease of the thoracic and lumbar spine.

Connolly experienced recurrent bouts of severe bronchospasms, asthma, and other smoking-related symptoms between 2004-2006, for which she was treated by her primary care physician, Dr. Susan Sandoughi of Brigham and Women's Hospital. Medical Records, Ex. 7.[3] Dr. Sandoughi also prescribed anti-depressants to help Connolly cope with her symptoms of depression and anxiety.

In July of 2006, Connolly complained of increased anxiety and expressed interest

---

[2] Although Connolly's appeal is focused on a critique of the ALJ's analysis of her mental health record, Connolly plausibly argues that her physical problems have exacerbated her mental health issues.

[3] Prior to April of 2008, Connolly had smoked one pack of cigarettes a day for twenty years. Medical Records, Ex. 6, 7.

in weight loss surgery.  Dr. Sandoughi proscribed prozac and suggested a resumption of therapy sessions.  *Id.*  In August of 2006, Connolly contracted pneumonia and had several asthma attacks.  Dr. Sandoughi referred her to a clinic for a consultation on surgical weight loss.  In April of 2007, Connolly again reported to Sandoughi that her depression and anxiety were worsening, and that she had decided to undergo the weight loss procedure.  Dr. David Lautz performed gastric bypass surgery on Connolly on May 16, 2007, which ultimately resulted in significant weight loss.[4] Tr. at 8.

On July 13, 2007, Connolly visited Dr. Sandoughi and reported fatigue, fever, chills, nightsweats, and augmented depression, stemming in part from having to declare bankruptcy.  Medical Records, Ex. 7.  On April 25, 2008, Connolly sought emergency room treatment after experiencing chest pain, dizziness, and numbness.  She was diagnosed with a myocardial infraction and underwent primary intervention with two drug eluting stents in her left anterior descending artery.  Dr. Michael McGlaughlin became her treating cardiologist, and prescribed an array of medications and tests.  On May 5, 2008, Connolly developed a hematoma in her thigh.  Medical Records, Ex. 7.

---

[4] Prior to the surgery, Dr. Lautz spoke to Dr. Joanna Bures, Connolly's psychiatrist, who told Dr. Lautz of Connolly's bi-polar diagnosis and her most recent hypomanic episode, which occurred in January of 2007.  As of May of 2007, Connolly was taking Abilify and Klonopin to manage her mood disorder and anxiety.  Dr. Bures reported that she had been seeing Connolly for ten years, but that Connolly would repeatedly discontinue treatment for long stretches of time.  Medical Records, Ex. 8.

On June 18, 2008, while driving her dog to the veterinarian, Connolly had a seizure and struck a tree. As a result of the accident, she suffered a back injury for which she still undergoes physical therapy. She was eventually treated by Dr. Jong Woo Lee, a neurologist. Dr Lee, after significant testing, prescribed anti-seizure medication and told Connolly not to drive for six months. In August of 2008, after experiencing significant pain and GI issues, Connolly was diagnosed with an anastomic ulcer by Dr. Mitchell Oliver. On August 12, 2008, Dr. McGlaughlin evaluated Connolly for hematemesis. In December of 2008, after an unremarkable MRI, Dr. Lee cleared Connolly to resume driving. Medical Records, Ex. 8.

On December 21, 2008, Connolly was admitted to the hospital with a GI bleed. Dr. Oliver performed an upper endoscopy and colonoscopy that revealed diverticular disease and hemorrhoidal disease. Medical Records, Ex. 8. In late January of 2009, Connolly presented to Dr. Sandoughi with symptoms of increased anxiety. She also admitted to drinking wine regularly in the evenings. Dr. Sandoughi asked Connolly to stop drinking. Medical Records, Ex. 8. In February of 2009, Dr. Oliver reported that Connolly's ulcer was healing, but that she now had a new ulceration in her small stomach pouch. *Id.* In late February of 2009, possibly as a result of the endoscopy, Connolly developed pneumonia; she also reported anxiety flare-ups. *Id.* In April of 2009, Dr. Sandoughi renewed Connolly's Klonopin and Prozac prescriptions.

On May 22, 2009, Dr. Lee found that Connolly's MRI was normal, but that her EEG results were abnormal. Connolly reported to Dr. Lee that she had suffered two recent episodes of visual disorientation. On June 25, 2009, Connolly experienced a second seizure; her husband took her to an emergency room and Connolly was placed back on a regime of anti-seizure medication. Medical Records, Ex. 9. Again, Connolly was instructed not to drive for six months. During a follow up visit with Dr. Sandoughi in early August of 2009, Connolly tested positive for cocaine use. Medical Records, Ex. 9. Connolly admitted to Dr. Sandoughi that she had used cocaine several times during the months prior to the visit. She also admitted that she was regularly drinking alcohol to the point of "blacking out." *Id.*

In October of 2009, Connolly saw Dr. Sandoughi and reported some improvement; she was taking a higher dose of Prozac and seeing a psychiatrist. Medical Records, Ex. 10. Dr. Sandoughi reminded Connolly to cut back on her drinking. On January 5, 2010, Connolly presented to Dr. Lee who found that she had developed a mild tremor in her right arm since taking the drug lamotrigine for her seizures. Connolly admitted to Dr. Lee that she had used cocaine three days prior to her seizure in June. Dr. Lee noted that the cocaine use may have triggered the seizure. Medical Records, Ex. 10.

On February 24, 2010, Connolly visited Dr. McGlaughlin and reported a slight

increase in chest discomfort, dyspnea, insomnia, some weight gain, and some heart palpitations. Medical Records, Ex. 10. When Connolly saw Dr. McGlaughlin again in August of 2010, her chest pain and discomfort had stopped. At an October 2010 check-up, Dr. Lee decided to keep Connolly on the anti-seizure medications.

Although Connolly is now permitted to drive by her doctors, she is afraid to do so for fear of injuring herself or others. She has regular doctors' appointments and sees a physical therapist for her back problems biweekly. Tr. at 15. As of the date of the hearing before the ALJ in December of 2010, Connolly was taking the following medications for her various physical and mental ailments: Prozac, toprol, aspirin, Lipitor, Klonopin, Prilosec, and plavix. Medical Records, Exs. 2, 6. Side effects from these medications include easy bruising and bleeding, loss of appetite, tiredness, and light headedness. *Id.*

### *Mental Health Treatment*

In 1994, Connolly began seeing Dr. Bures at Brigham and Women's Hospital, to treat her chronic depression and anxiety. Tr. at 11. Connolly saw Dr. Bures for approximately ten years until she moved to Plymouth and found the logistics of the visits too daunting. She managed her depression, in part, by taking medications such as Prozac, and she was able to maintain an active home and social life. In 2007, her gastric bypass surgery precipitated a course of negative health events. In 2008, after

the heart attack, her mental health problems intensified. Tr. at 12. At the urging of Dr. Sandoughi, in July of 2009, Connolly began visiting the Plymouth Center for Behavioral Health. She was diagnosed with major depressive disorder, anxiety with panic attacks, moderate alcohol dependence, and cocaine abuse in remission.[5] Connolly continues to regularly see a psychiatrist, Dr. Jay Stearns, as well as a therapist, Mr. Robert Remell.[6] Tr. at 17.

### ALJ's Decision

In applying the mandated five-step sequential process,[7] the ALJ found that Connolly met the insured status requirements of the Act through December 31, 2010, and that she had not engaged in any substantial gainful activity since April 25, 2008, the alleged onset date of her impairment (Step 1). R. at 14. At Step 2, the ALJ found that Connolly had a number of severe impairments: depression, anxiety, ischemic heart disease, a seizure disorder, discogenic and degenerative disease of the thoracic and lumbar spine, alcohol dependence, and cocaine abuse in remission. Id. Finding that Connolly's combination of impairments did not meet or equal an entry in the Listing of

---

[5] Connolly's depression symptoms include shyness, poor sleep, self-isolation, diminished concentration, low energy, and low self-esteem. Medical Records, Ex. 10.

[6] Mr. Remell is a licensed independent clinical social worker. R. at 18.

[7] Pursuant to 20 C.F.R. § 404.1520(a), there is a five-step process for determining whether an individual is disabled within the meaning of the Act.

Impairments (Step 3), the ALJ then proceeded with an assessment of Connolly's residual functional capacity (RFC) preliminary to his determination of whether she lacked the capacity to perform her past relevant work (Step 4). Finally, after finding that capacity lacking, he turned to a determination of whether Connolly nonetheless is able to perform other work consistent with her RFC (Step 5). *Id*. at 15-16.

At this final step, the ALJ determined that Connolly could perform unskilled, light work that requires only occasional climbing, balancing, stooping, kneeling, crouching or crawling, requires two hour increments of concentration throughout an eight hour workday, and involves minimal contact with the public and co-workers. *Id*. at 16-17. Basing his opinion on Connolly's age, education, work experience, RFC, and the testimony of the vocational expert, the ALJ held that Connolly could perform jobs such as office helper, photocopy machine operator, and mail clerk, jobs that exist in significant numbers in the national economy. *Id*. Therefore, he concluded, Connolly was not disabled between the alleged onset date, April 25, 2008, and the date of his decision, December 13, 2010.

## DISCUSSION

Judicial review is limited to determining whether the findings of the Commissioner are supported by substantial evidence. *See* 42 U.S.C. § 405(g). *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).

The findings of the Commissioner will be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). However, the Commissioner's findings "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

The Act defines "disability" as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). With regard to this definition, the Act further states that

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Connolly first contends that the ALJ erred at Step 3 when he found that she was not per se disabled pursuant to Medical Listing § 12.04, Affective Disorders, or § 12.06, Anxiety-Related Disorders. 20 C.F.R. Part 404, App. 1, §§ 12.04, 12.06. She

argues that after the ALJ determined that her depression and anxiety were "severe" impairments pursuant to Step 2, he then improperly injected his own medical opinion at Step 3 as to the level of impairment caused by Connolly's depression and anxiety.[8]

As a preliminary matter, the ALJ is not required to reconcile a finding that a claimant is not per se disabled at Step 3 with a prior finding at Step 2 that the claimant's impairments are severe. *See Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747, 748 (1st Cir. 1987), quoting *McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986) ("Step 2 . . . is 'designed to do no more than screen out groundless claims.'"). In determining whether a claimant is disabled pursuant to the Medical Listings, the ALJ determines whether certain criteria, listed in paragraphs B and C, equate to a "marked" impairment, which means more than moderate, but less than extreme. *See* 20 C.F.R. §§ 404.1520(a) & 416.920(a). To qualify, a claimant must have at least two marked impairments from the B criteria or evidence of C criteria.[9]

---

[8] A listed impairment is found if the diagnostic description in the introductory paragraph (i.e., Medical Listing § 12.04 or 12.06) and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied. The criteria in paragraph A equate to the symptoms of a particular mental disorder. The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity.

[9] To satisfy the B criteria, a claimant must have marked impairments of at least two of the following: restriction of activities of daily living; difficulties maintaining

To make a determination as to the level of severity of a claimant's restrictions, the ALJ may consider the treatment notes of a treating psychiatrist and therapist and "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record." *Autrey v. Astrue*, 2011 WL 1564442, at *6 (D. Mass. Apr. 25, 2011), quoting *Castro v. Barnhart*, 198 F. Supp. 2d 47, 54 (D. Mass. 2002). It is also permissible for an ALJ to base his determination of the severity of mental impairments on treatment notes and observations from a primary care physician, or other medical professional who has observed a claimant on a number of occasions, even though the physician has not treated the claimant for her mental impairments. *See Kou v. Astrue*, 2007 WL 4367512, at *6 (D. Mass. Dec. 11, 2007).

The ALJ analyzed the paragraph B criteria and concluded that because Connolly suffered no marked impairments, she was not disabled per se.[10] He found that Connolly suffered only a mild restriction in activities of daily living because she was able to "walk for exercise, drive a car, go shopping, and to perform household chores

---

social functioning; difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. To satisfy C criteria, there must be medical evidence of repeated episodes of decompensation, residual process disease, or an inability to live outside her home or evidence of the need to live in a highly supportive living arrangement. 20 C.F.R. §§ 404.1520(d), 1525 & 1526.

[10] It is undisputed that the evidence failed to establish the existence of any paragraph C criteria.

and yard work." R. at 16. He based this finding on her testimony, as well as her regular visits with Dr. McLaughlin.

In September of 2008, Dr. McLaughlin wrote to Dr. Sandoughi regarding Connolly's status, reporting, inter alia, that she had "been steadily increasing her exercise tolerance" and was "walking up to a mile three days a week, and climbed a large flight of steps at the beach recently with no difficulty." *Id.* at 416. In Januay of 2009, he noted that Connolly "is somewhat fatigued but is keeping up with her usual activities including a little bit of walking for exercise." *Id.* at 12. In February of 2009, Dr. McLaughlin again wrote to Dr. Sandoughi, noting that Connolly exhibited some symptoms of anxiety but was taking Klonopin and seeing a therapist, and she "is walking fifteen to twenty minutes as the weather allows and reports no change in her exercise tolerance." *Id.* at 410. In August of 2010, he noted that Connolly is "not exercising regularly" but that is "largely due to schedule and back pain, and [she] has put on some weight." *Id.* at 849.

Connolly testified that she is able to go shopping (when accompanied), perform some light house work, take her dog outside, and visit with neighbors on occasion. *Id.* at 55, 68. She makes meals, albeit simple ones, for herself and her two sons. *Id.* She also testified that because she has been home, she spent time working to obtain a mortgage modification so that she and her family would not lose their home to

foreclosure. *Id.* at 69. Connolly further testified that she is permitted to drive by her doctors, but prefers not to because she is still nervous about having another seizure or having a panic attack. *Id.* at 56.[11]

With respect to social functioning, the ALJ determined that Connolly suffered from moderate difficulties, a conclusion he made based on Mr. Remell's and Dr. Stearns' observations (as noted in the medical record) that Connolly was "depressed and anxious," as well as Connolly's own testimony that she "tends to self-isolate and is anxious in crowds." *Id.* at 16. Connolly's diagnostic evaluation noted that stressors in her life were attributable to her recent health problems, her lack of employment, and her financial difficulties. *Id.* at 842. In Mr. Remell's treatment plan notes from March and July of 2010, he identified Connolly's "target symptoms" of depression, lack of coping skills, low self-esteem, and ETOH[12] use as "moderate." *Id.* at 824-825. In both of these evaluations he noted that her symptoms were "improving." *Id.* In October of 2010, Mr. Remell's treatment plan notes identified her symptoms as somewhere

---

[11] In Connolly's application for disability benefits she wrote that she goes shopping for "food and staples" with her husband and children. R. at 165. The ALJ's reference to Connolly performing yard work is not present in the record, except insofar as Connolly was performing yard work the day that she had her heart attack. The error is too insignificant to affect the analysis.

[12] "ETOH" is a shorthand term for alcohol, often used in this context to denote alcohol abuse.

between moderate and severe, but found that she was still making some improvement. *Id.* at 823. During the same visit, Mr. Remell added "AA evaluation" to Connolly's list of goals, and noted her continued difficulty managing her alcohol consumption. *Id.* at 823-825.[13]

While Connolly's long history of battling depression and anxiety, as well as her testimony that she prefers not to socialize as much as she once did, supports a finding that her social functioning impairments are moderate rather than mild, the ALJ's ultimate conclusion that the impairment is less than marked has ample support in the record. Connolly testified that she interacted with neighbors on occasion, left her home on a regular basis to go shopping, and interacted regularly with an array of doctors and specialists who consistently noted that she was a "lovely" woman. Her therapist also noted that she was "cooperative" and "likeable." *Id.* at 831. Finally, Connolly's medical history does not support a finding that she is uncomfortable around people or does not like to socialize, but only that her interest in doing so has waned because of her depression and her anxiety.

Turning to the third paragraph B criterion, the ALJ found that Connolly had moderate difficulties with concentration, persistence and pace. He based his finding

---

[13] Several pages of Mr. Remell's observation notes are incorporated in the record but are, for the most part, unreadable. It is apparent, however, that reducing ETOH use was a main focus of Connolly's treatment goals.

on Mr. Remell's "observ[ations] that a lack of structure to her day and difficulty accepting her unemployed status contributed to her depression and anxiety symptoms, diminished concentration, and low energy. In addition, the claimant reported to [the vocational expert] that she experienced difficulty focusing and concentrating due to fatigue, depression and anxiety symptoms, and side effects of her medication." *Id.* at 16. Even if the ALJ was mistaken in his assessment as to Connolly's concentration, persistence and pace, it would not affect the integrity of his Step 3 analysis. To qualify as per se disabled, Connolly would have to satisfy at least two of the paragraph B criteria. There is not a shadow of a question but that the ALJ's findings with respect to the limitations that Connolly faces in her daily activities and social functioning are supported by substantial evidence; further, it is undisputed that there is no evidence of decompensation.[14] In sum, the ALJ's Step 3 determination that Connolly did not meet the necessary category B criteria for marked limitations, and therefore was not disabled

---

[14] "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode. The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Listing of Impairments, SSR 96-8.

per se under the Mental Health Listing Requirements, is fully supported by substantial medical and other evidence in the record.

Connolly next contends that the ALJ erred when he concluded that her mental health restrictions were functionally compatible with the ability to maintain attention and concentration for two-hour increments throughout an eight-hour day and that she was capable of working in a low-stress environment that requires only limited social interaction with the general public.[15] *Id.* at 74. Connolly argues that these restrictions "were provided to a vocational expert at [the] hearing and set forth in the hearing decision without a supporting or cited medical or vocational opinion." Pl.'s Mot. for Summ. J. at 11. Connolly accurately notes that no mental impairment RFC evaluation by a physician or clinician (treating or nontreating) appears in the record.

It is the ALJ's responsibility to make the RFC determination.[16] *See Kiklis v. Astrue*, 2011 WL 4768491, at *9 (D. Mass. Sept. 28, 2011). In making this

---

[15] As noted earlier, Connolly does not challenge the ALJ's RFC assessment with respect to her physical health.

[16] Steps 4 and 5 necessarily require an assessment of a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(5). To evaluate the RFC, the ALJ must follow a two-step process to: (1) determine whether the claimant has an underlying physical or mental impairment that could reasonably be expected to produce the complained of pain or other symptoms; and (2) if such an impairment exists, the extent to which it limits his ability to perform basic work activities. This latter determination requires an evaluation of the intensity, persistence, and limiting effects of the claimant's pain or other symptoms. *See id.* §§ 404.1545(a)(2)-(3).

determination, the ALJ should consider a claimant's mental health history and the opinions of her doctors. *See Guyton v. Apfel*, 20 F. Supp. 2d 156, 165 (D. Mass. 1998). It is true that the ALJ is not "precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the Secretary does not overstep the bounds of a [layperson's] competence and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990). "However, the general rule is that an expert is needed to assess the extent of functional loss. An ALJ may determine RFC only '[i]f th[e] evidence suggests a relatively mild . . . impairment posing, to the layperson's eye, no significant . . . restrictions.'" *Roberts v. Barnhart*, 67 Fed. Appx. 621, 622-623 (1st Cir. 2003), quoting *Manso-Pizarro*, 76 F.3d at 17-18.

In *Roberts*, the Court noted that although the medical evidence showed that many of the claimant's mental abilities remained intact – she was described as coherent, relevant, oriented and as having an intact memory – evidence also showed that she had difficulty maintaining attendance, following through with attending doctor's appointments, and leaving her house when she was depressed. The Court concluded that the ALJ erred in discounting the latter evidence in favor of the former, even assuming, as the Secretary represented on appeal, that the claimant's failure to comply with treatment was under her own control. "[W]e do not think that the ALJ

was qualified to make an RFC assessment concerning the extent to which claimant's non-compliance with treatment was under her control and the extent to which, even assuming compliance with treatment, claimant's maladaptive behavior would cease. As we have stated, an expert's RFC evaluation is required where 'the record . . . is sufficiently ramified that understanding it requires more than a layperson's effort at a commonsense functional capacity assessment.'" *Roberts*, 67 Fed Appx. at 623, quoting *Manso-Pizarro*, 76 F.3d at 19.

In making his determination of Connolly's RFC, the ALJ recounted her mental health history, putting particular emphasis on her gradually improving symptoms as she continued therapy and a monitored pharmacological regimen. He also emphasized that her alcohol (and drug) abuse was a pronounced factor in exacerbating her symptoms, though her alcohol dependence by itself was not debilitating. He relied in particular on the statement that Connolly made to Dr. Sandoughi in February of 2010 that she was "doing OK" and looking for work. He also noted that Connolly testified to having struggled with depression during her entire life, while managing the symptoms so as to have a full and rewarding social, work, and family life until the onset of her more serious health problems in 2008. He also highlighted the fact that she reported bouts of anxiety to her primary care physician only as her financial difficulties worsened, and her admission that financial problems were a major stressor in her life. At the same

time, the ALJ did not address Connolly's weekly panic attacks or her statements (as reflected in her testimony and by treatment notes) that she was too anxious to drive. He also omitted any consideration of the evidence that Connolly experienced significant fatigue resulting from depression and the side effects of her medications.

Although it was perfectly permissible for the ALJ to rely on the nontreating Disability Determination Services (DDS) physicians' RFC assessments in drawing conclusions regarding Connolly's physical RFC, both of the DDS doctors (Dr. John Manuelian and Dr. M.A. Gopal) reviewed only Connolly's *physical* medical history; neither of the DDS doctors addressed her mental impairments. The only assessment in the record of Connolly's ability to maintain concentration came from her own vocational expert, whose report the ALJ relied on in his Step 3 determination. The vocational expert's report, however, is less than conclusive. He noted that Connolly had difficulty concentrating for the entirety of the two-hour evaluation, exhibited problems following instructions as time passed, and required multiple times that questions be repeated. R. at 206.

Moreover, although it was within the ALJ's discretion to discount the often conflicting observations and largely conclusory opinions offered by Dr. Stearns and Mr. Remell in November of 2010 that Connolly was totally disabled, *see Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.1 (9th Cir. 1988), the ALJ did not address the fact that

in the last treatment evaluation in October of 2010, Connolly's symptoms had considerably worsened since March and July of 2010, which might possibly have explained their conclusion that Connolly was completely disabled as of November of 2010.

Although the source of Connolly's mental impairments may be her financial plight, her debilitated (though currently stable) physical condition, and her alcohol and drug abuse, where, as here, the record is "sufficiently ramified," the ALJ was not qualified to make an RFC assessment of the extent to which Connolly's mental impairments affected her functional limitations. *See Roberts*, 67 Fed. Appx. at 623 ("[V]iewing all of the evidence in the record as a whole, we think that the record indicates *more* than a mild impairment which imposes *more* than slight restrictions on claimant's mental ability to function. As a result, the ALJ was not permitted to make an RFC assessment, and an expert was required for this task."); *see also Beyene v. Astrue*, 739 F. Supp. 2d 77, 83-84 (D. Mass. 2010) (where the hearing officer determined that claimant could "concentrate for two-hour periods over an eight-hour day on simple tasks, interact appropriately with coworkers and supervisors, and adapt to changes in her work setting" based only on "consideration of [claimant's] credibility and interpretation of treatment notes and GAF [Global Assessment of Functioning] scores . . . [t]his conclusion was not obvious from the raw medical data, but required

an interpretation from one with more skill than a layperson."); *Rivera-Figueroa v. Sec'y of Health & Human Servs.*, 858 F.2d 48, 52 (1st Cir. 1988) (improper for ALJ to assess claimant's limitations without any mental health RFC assessment of significant mental impairments).

Because the ALJ's finding with respect to Connolly's mental restrictions was not supported by substantial evidence, his RFC findings were flawed. As a consquence, he did not meet the Commissioner's burden at Step 5 of demonstrating that Connolly could perform jobs existing in the national economy. *See Coggon v. Barnhart*, 354 F.Supp.2d 40, 61 (D. Mass. 2005) ("In order to rely on a vocational expert's testimony, a hearing officer must base her hypothetical on a substantially supported assessment of the claimant's functional limitations."). *See also Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001) (at Step 5 the burden shifts to the Commissioner to show that a claimant is capable of performing at least some available work).

The court has no opinion as to whether Connolly is qualified for disability benefits, nor does it believe that given the otherwise solid conclusions of the ALJ, anything more is required than an expert evaluation by an independent examiner or a treating clinician of the extent to which Connolly's mental impairments may affect her RFC.

ORDER

For the foregoing reasons, Connolly's motion to reverse the decision of the Commissioner is <u>DENIED</u> in part and <u>ALLOWED</u> in part. The Commissioner's cross-motion for an order of affirmance is <u>DENIED</u>. The Clerk will remand the case to the ALJ for further proceedings consistent with this opinion.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE